Hear ye, hear ye. This Honorable Appellate Court for the Second Judicial District is now back in session. The Honorable Susie F. Hutchinson presiding. Please be seated. Your Honor, let me read some of the documents. Your Honor, the second case on the docket this morning is 2-23-0148. The defendant's name is David Cornwell. The defendant's appellee is Terrence E. Williamson. The defendant is Kellett. Arguing on behalf of the defendant, Mr. Anthony Santella. Arguing on behalf of the appellee, Mr. Miles J. Kellett. Good morning, counsel and guests. Sorry we're a little late. We were deep in discussion of our last case, but we will pay as much attention to your case as we did to theirs. So, Mr. Santella, whenever you're ready, you may proceed. Good morning, Your Honors, and may it please the Court. My name is Anthony J. Santella, and I represent Terrence Williamson in this appeal. The trial judge's finding of no possible neglect in defense counsel proceeding to trial without receiving subpoenaed medical records was not based on the facts. The trial court said that defense counsel received the records, although the record on appeals showed defense counsel did not receive them until after being told the jury reached a verdict at trial. And the trial court said that defense counsel got the information from the medical records in front of the jury through a stipulation, although the record showed no stipulation that was entered at trial relating to these records, nor does the record on appeals show that that information was entered through other means. Simply put, the trial court got the facts wrong and manifestly erred. Well, let me ask about this stipulation. I know when things are promised or things are identified as this is going to happen, it is taken very seriously if it does not happen. But I guess what prejudice resulted from that particular fact, that there would be a stipulation but then none occurred? Or what damage occurred? Specifically at trial? Yes. Well, so to offer two points of response, I think first just to note that this is a preliminary inquiry and the prejudice prong might not be as fully developed as it were if there was appointed counsel who could fully examine that issue. However, second, this was material evidence that the jury didn't deliberate with of a specific denial of sexual activity from a complaining witness to a neutral third party and a figure of authority, a medical doctor, which was different from the other denials that that complaining witness testified to, which was to her mother, whom she said she didn't trust. So there is something relevant to having that sort of evidence from the defense's perspective where it is a denial to that third party, which is someone who's not part of this family that the complaining witness said she does not trust. And just to note, this is a case that boiled down to credibility determinations in somewhat of a unique way based on when the allegations were made relative to the incidents or when the incidents were said to have occurred. There was no physical evidence. There was no DNA or anything of that sort. The jury was really solely deliberating on the witness testimony and the evidence the defense produced that would undermine any credibility. But didn't the jury hear that the young woman had said, I'm not sexually active or denied that question to both her mother and the doctor? The short answer, Your Honor, is the jury did not hear that the complaining witness denied being sexually active and did not hear that she denied any sexual activity to her doctor. There was, however, testimony that I think Your Honor is referring to that when the complaining witness went to the doctor, the doctor looked at her, and obviously this complaining witness was later found to have had a tumor in her stomach or abdominal area that was apparently bulging or made it look like she was pregnant. The doctor, according to the testimony of the complaining witness, shook her stomach and said, You have a full-term baby. And the complaining witness's response in her testimony was, That's impossible. Or it's impossible that I have a baby. This is not the same as an outright denial. And that's not what – pardon me. From the jury's perspective of how they would analyze the statement from J.B. that it's impossible I'm pregnant versus a statement of an outright denial are two different things. But didn't she tell her mother she was not sexually active? And didn't her mother identify that to the jury? Well, the – and this relates to Your Honor's question on the prejudice. I think there's a difference here between what the complaining witness would say to her mother, who she testified she didn't trust, and also noting that part of the state's case and trial was to say that the mother was, you know, at odds with the complaining witnesses and was, you know, on the side of the defense. And so it's really trying to put in the jury's mind that we can't trust the mother, and obviously this complaining witness said she didn't trust the mother. So there is something different between the denial to the mother than a denial to a third party. I think from the perspective of a defense attorney, this is really – in a case like this, this is some of the best impeachment that you could ask for, is that you have a complaining witness who says she doesn't trust her mother. Well, here's a denial to a whole other person, and this person just told you that you have a baby. Is there any indication in the record that she was alone with the doctor? Because I guess I had drawn the impression, I don't know if it's from the briefs or from the record itself, the testimony itself, that the mother was there for at least some of this discussion with the doctor. And I don't know whether it was all of it. Which leads me to another question. I mean, I'm gathering you're saying it would have been a little bit more, a little better impeachment, because it would have skirted this I knew I wouldn't be believed or my mother was, you know, the defendant was present, or some of these other explanations for previous inconsistent statements, of which are several in the record. But where are these records? Because – and why aren't they in this record, or does it matter? Because the judge, the trial court says, by the way, the records are back, they're here, I just reviewed them, and they did not add anything to the case. And I should add, previously in the record, when they're talking about the possibility that they're going to get them and would it continue the trial or not, you know, it seemed like the train was moving, it looked like the trial was going to go, both attorneys asked for in camera, and the judge says something to the effect that I understand, if they're relevant, yes. If they relate to impeachment, the state's attorney concedes, that would be impeaching, or that would be good cross, or something of that nature. And the court responds, I understand what you're looking for, and I'll keep an eye out for them. So from that I draw, he knew he was to be looking in those medical records for impeaching statements by the victim as they relate to sexual activity. He got them in right as the jury was deliberating, and he returns them to, as far as I can tell, maybe the clerk, there's a comment in the record, like the clerk had to copy, I think it says, but he's giving them to the state and to the defense, so they're there, and he says they do not add anything to the case. Would it be reasonable to draw from that that the court found nothing impeaching? Because he promised he'd look for it, and then he returned the record, said they don't add anything to it, he gave each counsel copies, so that's one question. The other is why aren't they a part of this record? Then we'd know whether or not they would have been helpful. Sure. Just to briefly answer Your Honor's first question as to whether... Which is not brief, which I apologize for. That's okay, I think I got it all. I don't believe there was testimony from JB specifically as to whether her mother was in the room during the time this conversation with the doctor would take place. However, at the preliminary inquiry, Mr. Williamson represents that he had learned from Antoinette that there had been this denial made. I can't say whether or not she was in the room for all of it. I think it appears she was in the room for part of it. Certainly this was her minor daughter talking to a doctor, so I think we can assume that she was there for at least part of those conversations. However, it's a little unclear as to the specific statements at issue. To move on to us not having the records, there's two parts to your question. One, the incompleteness in the record, and two, the judge's statements about the record. I will answer the judge's statements about the record first. I think looking to the context of the judge's comments and when these records came in is really important to answering your question, which is the judge made the in-camera inspection sometime during the deliberations and then informs the parties. After telling the parties the jury had reached a verdict, I think that there is – He also says they did not add anything to the case. And I think that that's at best an ambiguity, Your Honor, because part of the in-camera inspection was to see what else was in those records, to analyze their points to the case. From the judge's perspective, it might have been – I don't mean to interrupt, but I think that was the only thing, because obviously they're HIPAA protected. The core trial court had issued a HIPAA order. That's in the record. The attorneys brief them why they want it. State concedes, yes. These would be impeaching if that statement was made. Why wouldn't I assume the court meant what he said? He was briefed on the issue. He promised he would review it with the issue in mind, and he makes a statement that it appears to me like he meant there's nothing impeaching. Why would I assume it's – I can't rely on that as anything relevant to these issues. I think that the answer here is that that also needs to be a determination made by defense counsel after reviewing the issues. That's not to dispute the importance of the in-camera review, but defense counsel had subpoenaed these records for a specific reason and would be in a position to say, well, is this evidence impeaching and was this evidence put before the jury? And so at the context and the time of when the records arrived, again, you know, this was after the jury had indicated they had a verdict. The court handed the copies to the parties, and then the jury came out and delivered the verdict. So there isn't necessarily a timing in the record where I can see where the defense attorney is able to review the records then and to be able to make that determination. And I think that, again, goes to suggesting the possible glut that was raised in the pro se claim of ineffective assistance, which is the defense attorney subpoenaed these records based on the representation that they contained what Williamson and defense counsel said they did. They would be in a better position to say, well, is this relevant to the case? And at the very least be able to motion to admit that evidence if it had been received prior to trial or if defense counsel had taken actions to try to get that information in, such as through, you know, a continuance or stipulation or through other means. And so I think that that's the answer to the question, and that defense counsel still needed to review those records, and I don't think that that defeats the pro se claim of Mr. Williamson, at least as far as possible neglect, because those records were sought for a purpose and what he and defense counsel said was in those records certainly was not put before the jury. As to Your Honor's second question about the incompleteness in the record, simply put, yeah, the medical records aren't there. They're on the common law record, and nobody reads from them verbatim. However, the issue on appeal relates to the very fact that we don't have these records, and I don't think that that's an incompleteness that can be construed against Mr. Williamson. And just to offer an example why, if you look at the common law record page 165, when the subpoenaed medical records did come in, the trial court issued an order saying, quote, under no circumstances is the defendant even allowed to have these records. They're only going to go to the attorneys. So it's not clear to me that Mr. Williamson would ever be able to get his hands on those records, and I think a finding that there is an incompleteness here that could be construed against Mr. Williamson risks the creation of an impossible standard for appeals from preliminary inquiries in the sense that Mr. Williamson is now being thrust in the position of a pro se litigant. He is not necessarily going to have the knowledge and experience and ability to then subpoena or resubpoena the medical records and deal with the HIPAA-related issues in order to get them. The Illinois Supreme Court in the NITS case said that the record on appeal for the preliminary inquiry issues is made during the preliminary inquiry, and so that's what we have to work off of here. It's, you know, the party in the best position to obtain those records and answer those questions would be new counsel appointed on appeal. Not on appeal, new counsel appointed in the Krankel proceedings, because new counsel would have the ability to get those records and to determine the answer to the questions such as is there any discrepancy between what's purported to be in the records and what's actually in the records? How do we analyze prejudice in the context of an ineffective assistance of counsel claim? But Mr. Williamson certainly was not in a position to get those records, and when they came in the court ordered he wasn't supposed to have them. Counsel, isn't prejudice part of this? I mean, you're asking us to assume that the contents of the medical records would have shown best case scenario, right? And isn't there absence to be construed against your client rather than against prosecution? Well, I think there's kind of two separate questions here, Your Honor. And first, as to ‑‑ pardon me, just to continue answering the question. As to prejudice, in a preliminary inquiry, the trial court is able to consider legal merits of the claim. It's not just, you know, the facts of the claim, it's facts and legal merits. So I do think that there is, you know, an arguable level of ineffective assistance of counsel that the trial court can consider in a preliminary inquiry. However, I don't think it rises to the full level of the ineffective assistance claim, because, again, it would be an appointed new counsel that could be in a better position to develop that claim. That doesn't mean that there's not, you know, a role of the trial court to examine. Is there arguable deficient performance? Is there arguable prejudice? Here it is arguable prejudice in the sense of what I've already stated of the material nature of this denial, to who it was made to, and to how that would affect the, you know, maybe the way the jury is viewing these accusations with an outright denial to a third party. I think that is arguably prejudicial, and it would require a new counsel to be able to develop that prejudice, you know, further as to in the full ineffective assistance claim. If I could just offer an analogy, and I'm not saying that these are entirely the same, I think it's a little bit similar to, say, a first-stage post-conviction standard where, you know, is there a gist of a constitutional claim? Again, I'm not saying those are exactly the same, but I think it's analogous at least to say we're not looking at the full ineffective assistance yet, but the court can look at the merits, but it's still at that kind of reduced level. Here we're looking for possible neglect, and I think there was possible neglect in defense counsel proceeding to trial without those records, and I'm sorry, I know Your Honor had kind of a separate question here. I'm not sure if I answered everything that Your Honor wanted. No, I think you covered it. Okay. Well, just to briefly conclude here, this court should reverse the finding of no possible neglect from the trial court and remand for further critical proceedings, including appointment of new counsel. In the alternative, the trial court did get the facts wrong on the stipulation, and if this court disagrees to remand for appointment of new counsel, it should remand for a new preliminary inquiry under which the court can analyze the claim under the correct facts. Thank you. Unless Your Honor has further questions. Well, I was going to say, defense counsel does represent that there was a stipulation. It's, I'm not exactly sure, maybe at the record 736, 737, and the state had always said that they were amenable to stipulation. So I'm not sure why this is an issue here. At the time when the state said that, Your Honor, and I think the exact page site is bar 130, the trial court said that they're amenable to a stipulation on the doctor's testimony. However, they're not willing to stipulate until they actually get the records and see them. The state didn't get the records until the same time as defense counsel did. The subpoena was returnable to the court. The court got it and passed them out. Yes. And from the very statement of the prosecuting attorney, even if a possible stipulation had been floated early on, the prosecuting attorney said, well, I still want to see what's in the records before we agree to that, so we can avoid having to call the doctor. Obviously, no doctor testified and no stipulation was entered. Certainly no one turned to the jury and said, we have a stipulation and here's what it says. Right. And so that's, the fact that the judge says that, he's not representing that to the jury. He's talking about what he remembers of the record. That's the only thing that I'm concerned about. I don't know that he was mistaken. He, and if he was mistaken, he did not identify that to the jury. Well, going to what was preliminary inquiry, there was a representation of defense counsel. It was a stipulation, and the trial court relied on that representation. And a stipulation is, that's an agreement with clear and definite terms. So in the sense that any possible stipulation was suggested, possible is put in there in front of a reason. A stipulation is certainly not a handshake agreement, and we'll hammer out the details later. Because the record on appeal for a preliminary inquiry issue is created at the preliminary inquiry, really we're going off of both the defense counsel and judge said there was a stipulation, and that's just not the case. And I don't think that came up in front of the jury because no one ever was suggesting during trial that there was a stipulation. That's why it's a mistaken fact, and that's why it's manifest error. All right. Thank you, Your Honor. Mr. Kelleher, you may proceed. Good morning, Your Honors. Good morning. Counsel, Myles Kelleher on behalf of the people. May it please the court. The trial court properly found that defendant's allegations of ineffective assistance of trial counsel failed to show possible neglect of the case. There are numerous reasons why this court should reject defendant's claim and affirm defendant's convictions. First and foremost, as Justice Mullen pointed out, the record is incomplete here. It doesn't contain a copy of the medical records. And the case law is, you know, well settled that any doubts arising from an incomplete record must be construed against the appellant. Here in the defense. Let me ask this. If it never was entered, file stamped entered as somebody's exhibit, it would not be in the actual record. The next question is, why couldn't someone at this level subpoenaed those records? So that they could see what they said and see if there was any misrepresentation by the parties, by the counsel on both sides about what was actually contained in those records. Well, that would be the appellant's burden to do, if in fact the appellant thought that there was a potential claim here. Or, you know, it could be possibly a matter for a post-conviction petition, too, if it was something outside the record. However, on direct appeal here, we don't have that. So that's the first reason. And I would just note, the defense is arguing that what was in the medical records was not put before the jury. Well, how do we know that if we don't even know what's in the medical records? So that's the first reason. The second reason was also mentioned, is that trial court conducted an in-camera review once these records arrived during jury deliberations. And trial court made a specific finding. Trial court said that in the court's opinion, they don't add anything to the case. Well, in fact, if this subpoena was directed to the court, it never would have gone to the state or to the defendant before the trial court looked at it, correct? Yes. And that was the trial court's job to review that record, because there's a minor involved in other sensitive evidence, so that there would be no misuse of that record, correct? Yes, that's correct. And it was always contemplated by the parties pre-trial that if the records did arrive, the judge would conduct an in-camera inspection of those. And there was no agreement before they arrived that he was going to give those records to either party, correct? I don't believe that was put in the record. But it is notable that the judge did know exactly what to look for, because the judge knew why the defense was subpoenaing these records. And that brings me to my third point, which is trial strategy. Counsel made it well known that he wasn't even sure what was in these records. He used words like they may have some information that's useful to the defense, perhaps something that might be useful for impeaching or attempting to impeach J.B.'s credibility. But he wasn't sure, so nobody was sure at that time. And trial counsel had doubts as to the usefulness of this evidence, because it was really dealing with a sensitive topic at a sensitive time. This was a medical appointment where the victim J.B. has this large growth in her abdomen. She doesn't know what it is, and if you put yourself in her shoes, try to imagine what she was facing at the time. She's 12 years old. She's already been subjected to sexual assaults by her stepfather on multiple occasions. She doesn't trust her mother. She doesn't feel like her mother would believe her. Her mother and stepfather have already asked her, have you been sexually active? And she specifically said, no, I wasn't sexually active. So now she's in the room with the doctor and her mother, and she does testify that when she's in the room, she said, the doctor, he told my mom I had a full-term baby. And at that point, J.B. says, that's impossible. So the mother's in the room, too. So now, does anyone expect that at that moment, when she's under enormous stress, not knowing what her medical situation is, she's suddenly going to decide, hey, this would be a good time to talk about all the prior sexual assault that my stepfather inflicted on me. No, she's a 12-year-old child. She wants to know what's this thing in my stomach that's turned out to be a large cancerous tumor. So it's just preposterous to think that, you know, under those circumstances, she would want to talk about her past sexual abuse. And even if she did deny to the doctor, are you sexually active, well, that goes to the third thing, prejudice. That he can't, fourth thing, that he can't show. You know, this is already cumulative. J.B. has already talked about this. This came out before the jury. She denied being sexually active. So is it really conceivable that the jury, having already heard J.B. deny that she was sexually active, and having her already say that she responded, that's impossible, when the doctor thought she was pregnant, initially, that, well, I don't know. If they had heard it one more time through some stipulation, suddenly the jury is going to realize, okay, well, now that she's said it to the doctor. Well, there could have been a more definitive statement, or perhaps something better for impeachment purposes, the way it was phrased, or how the question was asked. That could have been in these records. So it's speculation whether there could have been something. Well, yeah, I think you're right about that. But we're analyzing the actions and decisions of trial counsel at this time. And so proceeding without that information is the crux of what we're considering here. Right. And trial counsels have to make all types of strategic decisions. Maybe, you know, hundreds during the course of a trial and pre-trial. And Strickland talks about that. But what strategy would support the decision to forego a potentially useful piece of impeachment information? Because, first of all, the counsel had doubts as to whether it would even be effective. And there was a risk here trying to attack the victim's credibility during this moment. She's in a doctor's office with a mother she can't trust. You know, perhaps if the jury perceived him as, like, beating up on this poor victim at this vulnerable time in her life, that could backfire. That could garner sympathy with the victim. And I think the trial counsel was well aware of that. He even said, I thought the jury would see right through it. That's not the time that she wanted to come out and make any accusations. So he had doubts as to the usefulness of this. And obviously if this was some critical piece of evidence that he needed for his defense, you know, in that situation, yes, it might be ineffective not to proceed to trial without that. But this was not that type of case. This was a type of case where, you know, at best it might be something that potentially might be impeaching. Maybe, maybe not. But it did come out at trial. So it would have been cumulative. Well, but as the defense is saying, it's a credibility determination. It might not be cumulative to have heard something a third time as opposed to a second time. You understand what I'm getting at, which is that if there is some means of attacking the credibility without offending the jury, it might be done through repetition of a statement denying a physical act. Yes, I understand, Your Honor, what you're saying, but Strickland talks about the numerous ways competent attorneys can try a case. And, you know, no two attorneys are going to try a case exactly the same. And these are the strategic decisions that attorneys have to make. And just because one attorney might do things one way and another might do things another way, that doesn't mean they're incompetent. That just means it's different strategy, and there's a wide range of strategy. And arguably, in this case, you know, the whole notion that if she denied that she's sexually active, that somehow that can be equated with being sexually assaulted, they're not the same. And there's a significant distinction between someone who's sexually assaulted and someone who's characterized as sexually active. And, you know, no victim is going to confuse the two, and they shouldn't. You know, unfortunately, there's already a potential stigma attached to victims of sexual assault and abuse. One other question, was there a motion to continue at any time? And related is what was the rush then to trial on the defense's part? Well, first of all, the counsel had the assurance that if the medical records did come in, there would be an in-camera review and a likely stipulation by the state. So that was a factor he could consider, and he also had to consider just the usefulness of, you know, how essential is this to my case? And there's many reasons to understand why he had doubts as to the usefulness about this. And the point I was, you know, trying to make earlier is just that there's a big distinction between someone being sexually assaulted and someone being sexually abused. And put yourself in the, if you imagine a 12-year-old, are we going to expect her to now, she's been a victim of sexual assault, to now characterize herself as a sexually active person? Well, I thought you made that point, you know, well in your brief. But my concern is, given that both the defense, defense counsel and the court were laboring under a mistaken, you know, misapprehension that there was a stipulation and there wasn't, I mean, is it, is that manifestly erroneous? No, no, Your Honor. And first of all, it's not exactly clear what they meant if they were referring to, you know, the pretrial agreement of the party. But even, you know, let's say for... I would have to say from my reading of the record, it's clear, the defense says there was a stip, the court says there was a stip, so you got it in. I think the judge's quote says, so you got it in. Yes. But it wasn't in. I guess my concern is, even that might be manifest error. The manifest error goes to the ultimate rule in the ultimate finding. And, you know, how the trial court judge got there is, you know, can be helpful. But if, in fact, there was a mistake along the way, on the way to the ultimate finding, I submit that you have to consider the record as a whole. You have to look at all the trial court's comments and, first and foremost, his in-camera review of the record, where he specifically found that the medical records don't add anything to the case. I mean, that alone positively rebuts the notion that the medical records contained evidence that might be favorable to the defense. But then... Just as Mullin pointed out before, when the trial judge said that, is it reasonable for us to believe that he knew what he was looking for and the answer to that is yes? And did he find that in his statement, it would be no. So he did know what they were looking for and he didn't find that, correct? Yes, exactly. Even though he didn't say, I didn't find anything that you could impeach the victim with. Right. When you look at the record as a whole, it's clear that when the judge said they don't add anything to the case, he was referring that they wouldn't potentially help the defense. So he knew exactly what he was looking for, as you mentioned. But I would also note that the trial court in the comments did talk about trial strategy. So he was well aware that trial strategy was, you know, essential here. And also, when he talks about it did get in, whether it got in through J.B.'s statements or through a stipulation, really, he didn't know. He knew the jury heard her denial that she was sexually active and they could do what they wanted with that in terms of assessing her credibility. Yeah, denial was also subject to cross-examination, correct? Yes, Your Honor. So for all these reasons, the people respectfully request that this Honorable Court affirm defendant's convictions. Justice Kennedy and Justice Mullen, anything else? I'm sorry. All right. Mr. Santella, you may present a reply or rebuttal if you wish to. Thank you, Your Honor. I have three points I'd like to respond to. The first has to go with the incomplete record and the question of what is in these records, the medical records. We can say what's in these records for two reasons. The first is that due to the limited purpose of the preliminary inquiry to develop a record in order to determine whether to appoint new counsel, we have to effectuate that limited purpose, the trial judge asked defendant and defense counsel, what's in these records? And they both gave the same response, which is that they contain this denial, outright denial of sexual activity or sexual conduct from J.B. to a doctor. Because the Illinois Supreme Court again said the record on appeal from preliminary inquiries is made at the preliminary inquiry. So that's what we're going off of. And as I had said in the first part of my argument, the best party in the position to evaluate that would be an appointed new counsel that could reobtain those records. The second point as to what was contained in the records is that pre-trial the state said the same thing, that these records contain an outright denial of sexual activity and also the judge in reviewing those records certainly at the preliminary inquiry didn't dispute defense counsel and Williamson's representation as to what was in them. He accepted the representation in the preliminary inquiry and worked off that representation. My second point in response is to the question of trial strategy. The state has said, you know, the defense counsel made a point in the preliminary inquiry to say, well, I had a strategy of not, you know, overemphasizing this or doing, you know, trying to antagonize the complaining witness. I think any defense counsel would agree that it's a valid trial strategy not to antagonize a witness that you might think is sympathetic to the jury. But that does not absolve a defense counsel from not putting in the information. And at least getting that in front of the jury. The question of how it's handled after that is the question of trial strategy. Here we know defense counsel wanted those statements and the information from the records admitted at trial. They spent, you know, several months trying to get these records. They were subject to several orders and then defense counsel represented that that information had been admitted at trial where in fact it hadn't. So the question of trial strategy isn't reached here. There's a lot of potentially valid trial strategy in this record where it's, you know, I'm not going to emphasize or antagonize this witness and her statements. Again, that would be valid if the statements were in or I got the statements into a stipulation. That would be valid if there had been a stipulation entered or, you know, defense counsel realizing that he didn't have the records before trial and moved to continue. Or try to get them in through other means such as impeachment or cross-examination or potentially a prior inconsistent statement through the mother Antoinette. Again, valid trial strategy isn't reached here where the statements simply were not in the record. Counsel, doesn't trial strategy encompass the decision whether or not to obtain a piece of evidence? Couldn't counsel have just determined no matter what this record says, I'm not going to use it because I'm not going to be in a position of beating up a 12-year-old's victim? Isn't that part of a strategy decision? Well, sure, but that's not what we have in this case, Your Honor, because defense counsel represented the information was there and that, you know, he wanted that information. He just didn't want to antagonize this witness. So I do think defense attorneys could make that as a valid trial strategy decision, but the point is that you can't operate solely, excuse me, it's not trial strategy to ask how the information was presented or got in if we're, you know, assuming it's in what's not. And here the information was not before the jury. I can't say whether defense counsel was mistaken or thought or why he said what he said, but certainly the information that was represented to be in these statements was not before the jury. And so it's not really a question of how am I going to emphasize this. It's just a question of he said they were in and they weren't. Okay. Now, Mr. Santella, the point about the stipulation comes up and when we're in the basic Krenkel hearing when the court asked Mr. Williamson, is there anything you want to say about your attorney? And one of the statements he says is Williamson said that the records could have discredited J.B. because they showed J.B. was asked by doctors if she had sex with anybody in 2015 and J.B. said no. And the defense counsel responds to that and J.B. went to the doctor. He was saying, you know, are you sure you haven't had sexual activity? I think you possibly could be pregnant. I believe her mother was there in the room at the time. My memory, if it serves me correctly. But J.B. said no. I haven't had sexual intercourse. I believe the state stipulated to that fact that she said that to the doctor. Now, that's at the very end of that particular statement. They now have that record. He has been, this is afterwards, you know, I don't know the timeline specifically, but it's where the defendant has a chance to complain. He's seen it. He's now saying that this is what it said and we already have that information essentially. So why, the fact that he says there's a stipulation, why is that critical when basically he's saying that was evidence that was in the trial court. Not the doctor, but the evidence that she had not had sexual activity in 2015. Your Honor, it's critical because the stipulation has a specific meaning with, you know, involving clear and definite terms. And everybody said that the information in the records was an outright denial to the doctor. I understand. And certainly, you know, J.B. testified that she denied sexual activity to her mother. That's not in dispute. But there is a material difference between how a jury is going to analyze hearing, I didn't trust my mother for these reasons and so I didn't tell her, you know, that this allegation had happened. But I think it's critical because it's a very specific case. It's a very specific case versus a doctor who shakes your stomach and tells you you're pregnant and how a person is going to respond to that instance. And the jury is going to analyze those things differently. So that's really the critical thing here is how is the jury going to analyze the evidence in this case if they had had that specific denial. And it would take no appointed counsel to really develop the full, you know, argument and emotion on an effective assistance, I think, to do that. But I think it certainly suggests possible neglect for a defense attorney to know that, or a defense attorney to know that, you know, this is a case that's going to have to be reviewed. to, you know, represent certainly and have this record on the way. I mean, the record was subpoenaed. It had been subject, you know, if you go back to the common law record, it had been subject to at least three HIPAA release authorizations. It had been said and discussed in multiple status hearings. So it wasn't a question of was this record not coming. People knew it was subpoenaed. And I think it suggests possible neglect. But then, therefore, go to trial and say, well, it's enough that she denied sexual activity to her mother that she didn't trust. I think a defense attorney is going to want to get that impeachment to a third party, to a neutral party, even in the context of, well, the mother might have been in the room. Again, what we know based on the facts of the record is that the doctor shook her stomach and said, you have a full-term baby. We don't know when her cancer diagnosis was made. We don't know how long it took for them to realize that she wasn't pregnant. We know that it would have been pretty easy for them to find out. It's not like this is a major male clinic situation. Well, I don't disagree, Your Honor. My point is just that it's not on the record. And that what we do know is that, you know, at that point, J.B. said, well, it's impossible that I'm pregnant. She did not say what was represented to be in these subpoenaed medical records. What was set at the preliminary inquiry, which creates the record on appeal, which is that there was an outright denial of any sexual activity or sexual conduct. And so that's really the big difference here. And it would take, and again, to point to what I said in the first part of the argument, I think there is arguable prejudice, and I think we can look at arguable prejudice and evaluating the merits of the claim at this stage. And I do think, you know, an appointed counsel would be able to develop that claim further to see if there was anything else there, as well as re-obtain the subpoenaed medical records and see, make a judgment as to, well, what's in there and could that have added anything in trial. And so just my final point to briefly conclude is that the state said that this was not manifestly erroneous from the trial court. And that it was not clear what, you know, the defense attorney in the trial court meant by stipulation. But manifest error means error that's plain and indisputable and not based on the record. Here, the state can't even say that, you know, there was a stipulation. It's entirely unclear as to where the stipulation idea might have come from, from my reading of the record. And I think that that is manifest error because it was not based on the record. There was no stipulation. And this Court should find the same. So if this Court has additional questions, I'd be happy to answer them. Otherwise, this Court should reverse and remand for additional critical proceedings, including the appointment of a new counsel or, in the alternative, a new preliminary inquiry. Thank you, counsel.  And thank you both, counsel, for your argument here this morning. We appreciate the additional take in person on the information. And we will take this matter under advisement. We will make a decision in due course.